REDFIELD *v.* MICHIGAN WORKMEN'S COMPENSATION MUTUAL INSURANCE COMPANY.

1. MASTER AND SERVANT — DANGEROUS MACHINERY — WARNING — CONTRIBUTORY NEGLIGENCE—WORKMEN'S COMPENSATION.

Where a former superior servant of a corporation testified that signs were placed on machines in the shop, marked "Hands Off," to warn employees from touching the machinery, for the reason that such act tended to disturb the adjustment, and the warning was not intended as a danger sign, there was sufficient testimony to support the finding of the Industrial Accident Board, that the warning was not against danger.

2. SAME.

*Held,* also, that signs placed about the shop advising servants not to clean machinery in motion did not prohibit an employee from removing collections of cotton which frequently gathered on a guard of the carding machine and that required to be removed in order to prevent imperfections in the cloth.

3. APPEAL AND ERROR—INDUSTRIAL ACCIDENT BOARD.
   Only where there is no proof to support a finding of fact can the court interfere with the finding of the accident board on certiorari.

4. MASTER AND SERVANT—WORKMEN'S COMPENSATION—INSURANCE —PRACTICE.
   Where the date of hearing was fixed on September 9th, and the insurance company which indemnified the employer against accidents did not appear, but. the attorneys for claimant appeared and were heard, no ground of objection could be based on the action of the board in declining to hear further testimony, though granting the insurer a hearing on a subsequent date.

Certiorari to the Industrial Accident Board. Submitted January 20, 1914. (Docket No. 157.) Decided January 4, 1915.        ,

Katharyn Redfield presented her claim for compensation for the death of her husband, William Redfield, while employed by the Dr. Denton Sleeping Garment Mills. Contestant, the Michigan Workmen's Compensation Mutual Insurance Company, bring certiorari from an order awarding compensation. Affirmed.

*Beaumont, Smith & Harris,* for appellant.
*George H. Arnold,* for claimant.

BIRD, J. Claimant's husband, William Redfield, was an employee of the Dr. Denton Sleeping Garment Mills, at Centerville. On April 18th, while so employed, he received a serious injury to one of his hands, which resulted later in an amputation of three fingers. Gangrene set in, and 16 days thereafter he died. His widow petitioned the Industrial Accident Board to have her claim adjusted. Proofs were taken and an award made by an arbitration committee of

$5.25 a week for 300 weeks. On appeal to the Industrial Accident Board the award was affirmed. The proceedings were then removed to this court by a writ of certiorari.

Exception is taken to the following findings of fact, it being claimed that the testimony does not support them:

"(15) At the time of the accident there was on each of the carding machines one or more signs reading, 'Hands Off,' such being placed on the machines by the manufacturer. These carding machines are so adjusted that they operate through a system of weights, and, when the weight reaches a certain point, the machine dumps down upon the apron; and, if a person coming near the machine should rest his hand upon it, such action would disturb the mechanism and cause the machine to dump, thereby seriously interfering with its operation. That the sign, 'Hands Off,' was put up, not as a warning against danger, but to prevent people from disturbing the operation of the machine and so cause it to dump.

"(16) There were also signs posted in the room reading, 'Cleaning machinery while in motion positively forbidden.' But this did not have reference to picking off cotton while machine was in motion, caught on different parts of the machine but not in a dangerous place. Picking off accumulations of cotton while the machine was in motion was part of the duty of the operator."

It appears from the record that the deceased was engaged in the carding room, in which there were four carding machines. Each machine consisted of a picker, a breaker, and a finisher. While these are different machines, they are connected together and operated as one set. The deceased had charge of one set, and it was his duty to watch the yarn as it came from the carder and take care of the machines while they were in motion. The testimony tends to show that the deceased was working at the time of his in-

jury on the finisher. The finisher consists, in part, of two cylinders with protruding ends of small wires. As the cylinders revolved in opposite directions, they separated the cotton. In front of the cylinders, and close to them, was a metal guard to protect the operator against injury. Sometimes the cotton would collect on this guard, and, if not removed, it would cause an imperfection in the product. The findings show that it was near this guard that the injury occurred. Exception to finding No. 16 raises the question as to whether the removing of the cotton at this point was cleaning the machines, in such a sense as to make his conduct a violation of the posted rule that, "Cleaning machinery while in motion is strictly forbidden."

Touching this question, Frank S. Cummings, who had been formerly general manager, and was at the time secretary and treasurer of the company, testified as follows:

"*Q.* I will ask if when you were manager, if a little piece of cotton got close to the wire where it was not considered dangerous to pick it off, would they pick it off without stopping the machine?

"*A.* Any careful employee, any conscientious employee, kept his machine clean.

"*Q.* Well, now, to get to that, would he pick off the cotton there?

"*A.* Yes, sir.

"*Q.* Where it might interfere with the product?

"*A.* Yes, sir; with reasonable care there was no danger.

"*Q.* Would you consider this sign, 'Cleaning machinery,' would it apply to picking off that little cotton that might injure the product—would you stop the machine for that?

"*A.* If it was not in a dangerous place, it did not apply to that; it was commonly done.

"*Q.* That is, the employees were expected to do it, weren't they, to keep them clean and pick off anything like that?

"*A.* Yes, sir."

Frank S. Thomas, manager of the company, testified that:

"I posted the signs all over the mill as a general precaution against accidents that might result from cleaning machinery while it was in motion. * * * The common custom, however, is in the mills to pick the cotton off from the cards, and I do not think our understanding of the words 'cleaning machinery,' included that.

"A. As I say, I don't think our understanding of 'cleaning machinery' included picking off such as it was reasonably safe to pick off while the machines were in motion, because it was really impractical to handle the machines in any other way.

"Q. To stop the machines to pick off a little cotton that might be caught in there that you could reach handily would impair the product of the machine?

"A. Yes, sir; every time you stop the card, there is unevenness produced in the work, and, of course, it involves a loss of time, and naturally every practicable attempt to keep the machine in continued operation is taken."

The testimony relied upon to support finding No. 15 is as follows: Speaking of the sign on the machinery, "Hands Off," the witness Frank S. Cummings testified:

"A. Yes, sir; those, perhaps, if I may be permitted to explain, were never put there as an indication of danger.

"Q. Did you put them there?

"A. Yes, sir; I was here when the machines were bought, and they were on the machines when they were put there by the manufacturers of the machines.

"Q. You don't know why the manufacturers put them there?

"A. Surely, simply because putting your hands on them disturbed the mechanism of the machinery. There is no danger from that. The machinery operates through a system of weights, and, when it reaches a certain weight, then it dumps down onto the apron, and, if anybody puts their hands in there, and dis-

turbed the mechanism, it makes it work irregularly, and it has to be repaired, it is simply a delicate piece of machinery that ought not to be handled.

"Q. Is there any danger connected with it at all?

"A. Not a particle."

Unless there was no proof to support the finding of fact, this court has no power to interfere. The foregoing testimony affords some proof of the facts therein found. It follows therefore that the exceptions to these findings must be overruled.

Several legal questions are raisea and discussed by appellant. Most of them rest upon the assumption that the foregoing exceptions are well taken. The exceptions having been overruled, it will be unnecessary to consider them.

A further question is raised that the death of the deceased was caused by the disease diabetes. This was a question of fact. The board, after taking the proofs, decided that this claim was not established by the evidence. An examination of the evidence bearing upon that question convinces us that there was room for such a finding, and therefore it must be regarded as final.

In connection with this question, another one is raised, and that is the refusal of the board to allow respondent to reopen the proofs after the day set for the hearing to permit further expert testimony to be introduced on. this question. The hearing on appeal was fixed for September 9th. On that day claimant's attorney was present and was heard. Respondents did not appear; they evidently relying upon certain suggestions made by them to the board for an adjournment. The matter was then held open until October 8th. On that day the board gave respondents an opportunity to be heard, but refused to allow them to introduce expert testimony because of the absence of claimant's attorney, and further refused to allow

depositions to be taken in Detroit and elsewhere, because of the added expense to claimant to have her counsel present. Section 11 of part 3 of the law gives the parties the right to be heard, and the right to introduce additional testimony on appeal. This right was given to them on September 9th. The fact that appellants' efforts to secure an adjournment proved futile on September 9th did not make it incumbent on the board to grant further time in which to take additional testimony.

We think the determination of the board should be affirmed.

BROOKE, C. J., and MCALVAY, KUHN, STONE, OSTRANDER, MOORE, and STEERE, JJ., concurred.